UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK SHIN,<br><br>           Plaintiff,<br><br>     v.<br><br>ICON FOUNDATION,<br><br>           Defendant. | Case No. 20-cv-07363-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND AND DENYING MOTION TO STRIKE WITHOUT PREJUDICE**<br><br>Re: Dkt. Nos. 36, 37 |

Plaintiff Mark Shin alleges that defendant ICON Foundation ("ICON") improperly interfered with his ownership and possession of ICX tokens, a crypto-asset native to the ICON blockchain network ("ICON Network"). ICON moves to dismiss all claims in the Amended Complaint as insufficiently pleaded and moves to strike the defamation claim under Colorado's anti-SLAPP statute, which is nearly identical to California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16. For the reasons set forth below, ICON's motion to dismiss is GRANTED with leave to amend for except Shin's fifth cause of action for prima facie tort, which is not a cognizable claim under either California or Colorado law and is dismissed with prejudice. Because I give Shin leave to fix the deficiencies addressed in this order, ICON's motion to strike is DENIED without prejudice.

## BACKGROUND

### I.  FACTUAL BACKGROUND

I start with a background on cryptocurrency and the ICON Network to inform the allegations made in this case. I then turn to the underlying incident that occurred in August 2020.

#### A.  Crypto-assets and Blockchains

Crypto-assets "are digital assets that use a variety of cryptographic principles to secure

transactions, control the creation of additional units, and verify their transfer." Amended

Complaint ("Am. Compl.") [Dkt. No. 28] ¶ 19. The first major crypto-asset was bitcoin. *Id.* ¶ 20.

The core feature of bitcoin, and nearly every other crypto-asset, is a ledger, called the blockchain,

"that tracks the ownership and transfer of bitcoin in existence." *Id.* ¶ 21. "Each bitcoin user has a

digital 'address' used to receive bitcoin. The bitcoin blockchain lists, publicly, every address and

the number of bitcoin associated with that address. The blockchain shows every bitcoin

transaction in which that address has engaged." *Id.* ¶ 22.

There are now more than 8,000 crytocurrencies, including ICX tokens on the ICON

blockchain. *Id.* ¶¶ 4, 24. "These cryptocurrencies generally distinguish themselves through

different iterations of similar features: a degree of decentralized governance (*i.e.*, no central

authority dictates which transactions are authorized); a degree of supply management (*i.e.*, the

community understands in what circumstances additional tokens will be generated and to whom

they will be given); and a blockchain." *Id.* ¶ 26.

Blockchains generate new cryptocurrencies in different ways. Bitcoin, for example,

"maintains its blockchain and provides for new bitcoin to enter the economy through a consensus

mechanism known as 'mining,' or 'proof of work.'" *Id.* ¶ 29. In this type of blockchain,

cryptocurrencies are "mined" by "having sophisticated computer programs perform complex,

resource-intensive automated verifications of past transactions, which are then added to the

blockchain." *Id.* Miners are "rewarded with new bitcoin" for their efforts. *Id.*

Other blockchains, including the ICON Network, generate new cryptocurrencies through a

"consensus mechanism called 'proof of stake,' which provides new currency to those who own the

most of that currency instead of those who expend significant electrical resources mining." *Id.* ¶¶

30, 32, 52. "Under the proof-of-stake consensus mechanism, individuals must 'stake' their crypto-

assets to be eligible to receive newly minted tokens. Issuers of some crypto-assets impose rules on

staking, such as (1) requiring minimum amounts; (2) imposing a minimum staking period; and (3)

imposing requirements on when an individual can 'unstake' their tokens." *Id.* ¶ 31.

**B.     Transfer and Exchange of Crypto-Assets**

Control of crypto-assets is shown primarily through control of cryptographic keys,

composing of two components: a public key and a private key.  *Id.* ¶ 33.  The cryptographic system of transfer and exchange is generally the same across most crypto-assets, including bitcoin and ICX.  *Id.*

For example, a public key is used to produce the bitcoin address, *i.e.*, "a destination for transfers of bitcoin, like the account number of a conventional bank account."  *Id.* ¶ 34.  Bitcoin addresses are "long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in a string, such as 1s5F or R3w9."  *Id.* ¶ 34.  "A private key allows owners of a bitcoin address to access it, like a long PIN or password for a conventional bank account."  *Id.* ¶ 35.  "A transfer of bitcoin is public to the extent that anyone can see the transferor's bitcoin address, the recipient's bitcoin address, and the quantity of assets transferred."  *Id.* ¶ 37.  For instance, "anyone could see that bitcoin address 1s5F transferred 10.3 bitcoin to bitcoin address R3w9," but the "names of the individuals or entities that control these addresses . . . are private."  *Id.*

Crypto-exchanges enable smoother and faster trading between individuals.  *Id.* ¶ 38.  To trade crypto-assets on a crypto-exchange, such as Kraken, Binance, or Velic, a user must first create an account on that exchange.  *Id.* ¶¶ 39, 59.  "The exchange will then provide that customer with a deposit address that the exchange controls" and "[w]hen the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset," and "then transfer the crypto-assets into one of its other addresses for storage."  *Id.* ¶ 39.  One "cannot easily trace transactions belonging to a particular individual," because the deposit addresses are "often different each time the customer makes a transfer."  *Id.* ¶ 40.  "When a customer wants to withdraw a crypto-asset from an exchange, she tells the exchange the address into which she would like her crypto-assets transferred, typically the address of the user's wallet, " and "[t]he exchange then debits the user's account and transfers a corresponding amount of crypto-asset from the exchange's reserves to that address."  *Id.* ¶ 42.

### C.  The ICON Network and ICX Tokens

As stated above, the ICON Network is a delegated proof-of-stake blockchain.  *Id.* ¶¶ 32, 52.  ICON "essentially aims for decentralized governance," where transactions "are verified by a

ledger shared within the community network itself, not controlled by a centralized authority." *Id.* ¶ 49. To achieve such decentralization, ICON "incentivized its users to run full nodes that themselves were comprised of community Public Representatives ('P-Reps')." *Id.* ¶ 50. A node "is a computer that connects to a crypto-asset network," whereas full nodes "enforce all of the rules of the network." *Id.* ¶ 45. Full node users "validate, send, and receive transactions and maintain a copy of the blockchain they are operating." *Id.* ¶ 46.

The ICON Network is controlled by 22 P-Reps. *Id.* ¶¶ 50, 63. P-Reps are able to "change the policies of the various nodes or communities of which they are part" on the ICON Network, and, through their voting power can "determine when to update the code underlying the ICON Network and help contribute to the overall ICON ecosystem by developing new apps and new features for the code." *Id.* ¶ 50. To implement proposed changes or updates to the ICON Network, the proposal must receive approval from at least 15 of the 22 P-Reps and reach 67% of the "stake weighted ICX vote" of the current P-Reps. *Id.* ¶ 100.

The ICON Network requires users to "stake" their ICX to vote for a particular P-Rep. *Id.* ¶ 51. Users can change their votes from one P-Rep to another. *Id.* ¶¶ 51, 64. While staking ICX comes at the cost of "remov[ing] it from circulation"—because the ICX is locked and not available for trading—users are "rewarded" for staking ICX by receiving newly-generated ICX. *Id.* ¶¶ 52, 54. Users can "unstake" or unlock previously-staked ICX, a process which typically takes anywhere from five to twenty days. *Id.* ¶ 53. Shin has purchased more than 250,000 ICX tokens since 2017, 150,000 of which have been staked on the ICON Network. *Id.* ¶ 58.

**D.      Revision 9 and Shin's Acquisition of ICX Tokens**

Sometime in August 2020, ICON published a software proposal, the "Revision 9 Proposal," which included a series of updates. *Id.* ¶ 62. On August 13, 2020, the Revision 9 Proposal was approved by 16 of the 22 ICON P-Reps and adopted into the ICON Network. *Id.* ¶ 63.

On August 22, 2020, following the implementation of Revision 9, Shin attempted to direct some of his staked ICX tokens from one P-Rep to another P-Rep through his ICON wallet. *Id.* ¶ 64. After initiating the redelegation process, "a process he had performed many times before, Shin

4

noticed that 25,000 new ICX tokens had appeared in his wallet." *Id.* ¶ 65. He thought that there was a "visual bug with the wallet software." *Id.* ¶ 66. When he tried redelegating his tokens again, he saw another 25,000 ICX tokens appear in his wallet. *Id*; *see id.* ¶¶ 68–72 (describing the redelegating process performed by Shin with corresponding screenshots). "Considering that the protocol was awarding him ICX tokens every time he initiated the redelegation process, Shin continued to repeat the process," and "[b]y the end of the day, he had received approximately 14 million ICX tokens from the ICX protocol." *Id.* ¶ 73.

Shin analogizes the situation to as if he was at a slot machine that continued to provide jackpot winning each time he put quarters in and pressed the same buttons, except that "the ICX tokens [he] acquired were issued the moment [he] received them and were not taken from the possession or control of ICON or any ICX user." *Id.* ¶ 74. Although he acknowledges that "[t]he authors and developers of the Revision 9 Proposal may not have intended for the network proposal to behave as it did," he argues that his actions were not malicious and that he is the "lawful owner of the ~14 million ICX tokens rewarded to him on August 22, 2020." *Id.* ¶¶ 75–76.

### E. Revision 10 and Freezing Shin's Exchange Accounts and ICON Wallet

After generating approximately 14 million ICX tokens, Shin transferred "a significant portion of" the accumulated ICX tokens to crypto-asset exchanges Kraken and Binance (the "Exchanges"). *Id.* ¶ 77. "A few hours later, he learned that he could no longer transfer *any* of his ICX tokens," including those purchased prior to August 22, 2020. *Id.* ¶ 77 (emphasis in original). ICON allegedly contacted the Exchanges and told them that Shin was a "malicious attacker," that the ICX tokens he transferred on their exchanges were "stolen" and "directed them to freeze Shin's accounts on those exchanges, which they did." *Id.* ¶¶ 78–79. He contends that the Exchanges relied on ICON's false statements in freezing his accounts. *Id.* ¶ 81.

On August 24, 2020, ICON posted on the Medium website (the "Medium Post") to inform the public that the ICON Network "experienced an attack by a malicious individual exploiting a vulnerability in the Multiple Unstaking Requests feature." *Id.* ¶ 85 n.2 (hyperlink to the Medium

Post).[1]  The Medium Post stated that, following the Revision 9 update, "a few community members altered telegram admins of unusual activity with a specific user account," which "was immediately escalated to ICON Team members" to investigate.  *Id.*  "The ICON Team, along with the help of dedicated community members and P-Reps, identified that the account was attacking the ICON Network using the 'SetDelegate' function to mint unauthorized ICX tokens."  *Id.*  ICON announced that "[t]hanks to the efforts of our exchange partners, P-Reps, and community members, we were able to recover the majority of the stolen funds and we know, with certainty, the identity of the attacker."  *Id.*  "Exchanges were notified with specific accounts to freeze," "[t]he network was then upgraded," and "the attacker was permanently stopped."  *Id.*

With respect to the Revision 10 update mentioned in the Medium Post, Shin contends that ICON's Revision 10 Proposal only stated that it was aimed at "fixing a vulnerability," but did not reveal "that it was also aimed at interfering with and programmatically restricting all of Shin's ICX," "effectively fr[eezing] all of [his] ICX tokens, including the ICX tokens he had previously purchased."  *Id.* ¶¶ 88, 92.  He alleges that "ICON fabricated and communicated both public and private false statements for the purpose of encouraging, coercing, and ensuring support for its Revision 10 Proposal, which ICON deliberately designed and intended to interfere with Shin's ICX tokens."  *Id.* ¶ 90.  Despite ICON's claimed decentralized governance, he asserts that ICON exercised its de facto control over the ICON Network and the P-Reps in order to implement the Revision 10 Proposal.  *Id.* ¶¶ 98–113.  ICON achieved the 15 P-Rep votes necessary to implement the Revision 10 Proposal "within a timespan of *just 10 minutes*," when the average network proposal takes approximately 10 hours.  *Id.* ¶¶ 108–09 (emphasis in original).

Shin claims that ICON used him as a scapegoat to distract from their culpability in releasing an undisclosed bug into the ICON Network through the faulty Revision 9 update.  He quotes one P-Rep who publicly commented:

There was no stealing.   The code functioned as it was written.

---

[1] Because the Amended Complaint references the Medium Post, available at
https://medium.com/helloiconworld/network-update-revision-10-b0ce0bd68cbe, I will consider it in deciding ICON's motion to dismiss.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).

> Unfortunate for the project but I personally think the actor (I don't
> think he was a hacker because he didn't hack anything) should be
> able to keep the ICX and do as he pleases. To be completely honest,
> I think the Foundation mitigated this in the wrong way. Instead of
> announcing new code review protocols, boosting development
> resources, etc, they pointed fingers at someone and started calling
> them a hacker. Very disappointing.

*Id.* ¶ 94.

ICON "stepped up" their efforts to "intimidate Shin in an apparent effort to scare him from publicly revealing their error." *Id.* ¶ 95. On August 24, 2020, Ricky Dodds, the ICON Strategy and Communications Lead, "reached out to Shin via Twitter Direct Messages and told Shin that ICON viewed him as a 'malicious hacker' and threatened to contact 'law enforcement within 24 hours' if he did not return the ICX tokens." *Id.* ¶ 96. Shin contends that "[n]either Dodds nor ICON ever intended to contact law enforcement, because they knew that [he] had not committed any crime." *Id.* Since the incident, he has been unable to "trade any of his ICX tokens," and has "also been frozen out of his Binance and Kraken accounts, preventing him from accessing any of the crypto-assets he owned on those accounts." *Id.* ¶ 97.

### F. Causes of Action

Based on these allegations, Shin pursues the following five cause of action: (i) a claim for declaratory relief regarding his property rights; (ii) conversion; (iii) trespass to chattel; (iv) defamation; and (v) prima facie tort. In opposition to ICON's motion to dismiss, he clarifies that his declaratory relief, conversion, and trespass to chattel claims are asserted under California law and his defamation and prima facie tort claims are asserted under Colorado law. Plaintiff's Opposition to Defendant's Motion to Dismiss ("Oppo. MTD") [Dkt. No. 45] 3, 7. He requests relief in multiple forms, including a claim for punitive damages, but has dropped his claim to attorneys' fees. *Id.* at 3 n.2.

## II. PROCEDURAL BACKGROUND

Shin filed this lawsuit on October 20, 2020. Complaint [Dkt. No. 1]. On January 8, 2021, he filed an Amended Complaint, mooting ICON's first motion to dismiss. On February 12, 2021, ICON moved to dismiss all the claims in the Amended Complaint and moved to strike the defamation claim under California's anti-SLAPP rule. *See* Motion to Dismiss Amended

Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("MTD") [Dkt. No. 36]; Motion to Strike Allegations in Amended Complaint Pursuant to Cal. Civ. Proc. Code § 425.16 ("Mot. Strike") [Dkt. No. 37]. I heard argument on April 28, 2021.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

## I. DEFAMATION

Shin asserts this claim under Colorado law; the parties agree that there are no material differences in the common law of defamation in California and Colorado and cite to both state laws in their briefing. Under Colorado law, a plaintiff must establish the following elements: "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the

publication." *Restore Life USA, Inc. v. LifeNews.com*, 2020 WL 1627041, at *2 (D. Colo. Feb. 13, 2020) (quotations omitted).

Shin alleges that ICON defamed him on two occasions: (i) in the Medium Post when ICON called him "malicious attacker" who acquired "stolen" ICX and (ii) when it purportedly contacted Kraken and Binance and informed them of the same. Am. Compl. ¶¶ 80, 131. ICON moves to dismiss the claim as insufficiently alleged under Rule 12(b)(6) and barred by Colorado's anti-SLAPP statute, which is nearly identical to California's anti-SLAPP statute.

### A. Sufficiency of Allegations

#### 1. Identifying Shin

"As common sense suggests, an allegedly defamatory remark is not actionable if it cannot reasonably be understood as an assertion of actual fact pertaining to the plaintiff." *Restore Life*, 2020 WL 1627041, at *5 (quoting *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 15 (Colo. 1994)). Shin concedes that the Medium Post did not mention him by name. Instead, he claims that the Medium Post contained a link to a spreadsheet detailing the transactions that Shin performed on August 22, 2020. That spreadsheet contained his ICON wallet address (a string of alphanumeric text), which he alleges "is sufficient to link the attack to [him] for many members of the cryptocurrency community." Am. Compl. ¶ 86. In his opposition brief, he claims that ICON was able to identify him based on his wallet address and that ICON has access to no more information about his identity than does any other member of the ICON community. Oppo. 21. Accordingly, he argues, there was a way for "anyone who read the blog post to identify [him] by name," because the cryptocurrency community included members who knew Shin's wallet address. *Id.*

Shin's allegations are conclusory and implausible. He does not explain how "many members of the cryptocurrency community" were able to link his wallet address to him, particularly when, as the Amended Complaint illustrates, cryptocurrency is grounded in anonymity. For example, he alleges that bitcoin, another cryptocurrency, is transferred publicly "to the extent that anyone can see the transferor's bitcoin address, the recipient's bitcoin address, and the quantity of assets transferred. That is, anyone could see that bitcoin address 1s5F

9

transferred 10.3 bitcoin to bitcoin address R3w9.  The names of the individuals or entities that control these addresses, on the other hand, *are private*."  Am. Compl. ¶ 37 (emphasis added).  In explaining how transfers are made to crypto-exchange platforms, he alleges that the "destination address is often different each time the customer makes a transfer, meaning that *one cannot easily trace* transactions belonging to a particular individual."  *Id.* ¶ 40 (emphasis added).  While he does not straightforwardly explain the functionality of the ICON wallet address at issue, allegations about how addresses work in other cryptocurrency contexts undermine his conclusory assertion that anyone could identify him through his alphanumeric ICON wallet address.

That ICON was able to identify which *account* made the allegedly malicious transactions on August 22, 2020 does not necessarily suggest that ICON knew that the account belonged to Shin.  He contends that ICON has access to no more information about his identity than does any other member of the ICON community, but he does not explain what that "information" is.  At the hearing, he disputed ICON's contention that it did not know his identity until this lawsuit was filed.  But even if ICON knew his identity, what matters for the purposes of pleading a defamation claim is whether anyone who read ICON's statements in the Medium Post was able to identify him.  Similarly, for his Twitter Direct Message allegation, he does not allege that Dodds knew either his identity or the owner of the Twitter account to whom Dodds wrote.  There is no allegation that Shin's identity was clearly tied to the Twitter account in question (as opposed to a pseudonym Twitter username).

With respect to the defamatory statement ICON made to the Exchanges, Shin alleges that each Exchange understood that ICON was referring to the "accounts" on which his transactions were recorded.  Am. Compl. ¶¶ 77–79.  He contends that each Exchange knew that he maintained the implicated accounts because he was required to provide that information when he opened those accounts.   Oppo. MTD 21 (citing Am. Compl. ¶¶ 38–42).  The Amended Complaint only states that "When a customer wishes to trade crypto-assets on an exchange, she must first create an account on that exchange. The exchange will then provide that customer with a deposit address that the exchange controls."  *Id.* ¶ 39.  It does not explain what "create[ing] an account" entails and what type of identifying information is implicated in that process such that the Exchanges

would know Shin's identity from what ICON told them. If, as Shin argued at the hearing, "anonymity dies" once users go to the Exchanges, then he must provide sufficient factual allegations to support that assertion.

As currently pleaded, the Amended Complaint insufficiently alleges that the defamatory statements made in the Medium Post and to the Exchanges identified Shin. *See Carlisle v. Fawcett Publ'ns Inc.,* 201 Cal. App. 2d 733, 741 (1962) (if the statement does not mention the plaintiff by name, additional information must be alleged to connect the statement to the plaintiff); *see also Golden N. Airways v. Tanana Publ'g Co.*, 218 F.2d 612, 622 (9th Cir. 1954) (stating in the context of pleading "if the person is not referred to by name or in such manner as to be readily identifiable from the descriptive matter in the publication, extrinsic facts must be alleged and proved showing that a third person other than the person libeled understood it to refer to him").

### 2. Unactionable Opinion

Shin contends that the statements made to the Exchanges in the Medium Post, accusing him of being a "malicious attacker" who had "stolen" funds, qualify as defamatory per se. Am. Compl. ¶¶ 131–32; *see Restore Life*, 2020 WL 1627041, at *4 ("Falsely accusing someone of a crime is defamatory per se in Colorado."). However, "[a]ccusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed." *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103 (N.D. Cal. 1999). "A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 387–88 (2004) (finding emails which accused a plaintiff of stealing copyrighted material were nonactionable opinions because the underlying facts were fully disclosed); *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1237 (N.D. Cal. 2014) (dismissing defamation claim at pleadings stage because, among other things, "the bases for Chanos's opinions were not entirely undisclosed") When facts are disclosed, "readers will understand they are getting the author's interpretation of the facts presented." *Wynn*, 75 F. Supp. 3d at 1233 (quoting *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995)). Readers are then "free to accept or reject the author's opinion based on their own independent evaluation of the facts." *Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th

1248, 1263 (2010).

ICON argues that the Medium Post disclosed the facts underlying its opinion such that anyone reading the post could have independently evaluated the facts and drawn their own conclusions about whether the August 2020 incident constituted a "malicious attack" and whether the minted ICX tokens are considered "stolen." *See Overhill Farms,* 190 Cal. App. 4th at 1263. Specifically, the Medium Post disclosed that the implementation of the Revision 9 proposal resulted in a vulnerability on the ICON Network that allowed someone to exploit the "SetDelegate" function and generate ICX in an unprecedented manner. *See* Am. Compl. ¶ 85 n.2 (incorporating hyperlink to the Medium Post by reference). It specified that when community members alerted administrators about unusual activity, administrators discovered that an account on the ICON Network was using the "SetDelegate" function to mint unauthorized ICX tokens. *Id.* The post concludes by informing the public that the Exchanges were notified with specific accounts to freeze, the ICON Network was upgraded, via Revision 10, and the attacker was permanently stopped. *Id.*

ICON contends that Shin cannot reasonably argue that these underlying facts are not true; he alleges the same in his Amended Complaint. *See id.* ¶¶ 62–63, 75 (discussing implementation of Revision 9, and acknowledging that the "authors and developers of the Revision 9 Proposal may not have intended for the network proposal to behave as it did"); *id.* ¶¶ 64–66, 73 (explaining that on August 22, 2020 he received 25,000 ICX each time he "initiated the redelegation process" to redirect some of his staked ICX, and although he thought it was a glitch, he "continued to repeat the process" "[c]onsidering that the protocol was awarding him ICX tokens every time he initiated the redelegation process," until he had received "approximately 14 million ICX tokens from the ICX protocol"); *id.* ¶¶ 77–78 (alleging that he transferred a significant portion of the 14 million ICX tokens to Kraken and Binance, but "[a] few hours later, he learned that he could no longer transfer any of his ICX tokens" because ICON had contacted Kraken and Binance to direct them to freeze his accounts); *id.* ¶¶ 81, 83, 85 (alleging his accounts were frozen or blacklisted and the ICON Network was updated with the implementation of Revision 10 "that sought to correct the bug that Shin discovered").

Shin argues that the Medium Post contained at least three false statements that take it out of the protectable opinion doctrine: (i) that ICON recovered the majority of the funds; (ii) that the tokens created by the bug were all from a single account; and (iii) that Shin "attacked" the ICON Network.  Am. Compl. ¶ 87.  He fails to explain how these alleged falsehoods challenge the disclosed facts underlying ICON's statement.  It is unclear how ICON's recovery of the majority of the funds *after* the purported attack is relevant to the disclosed facts underlying ICON's opinion that the incident constituted an attack in the first place.  The second alleged falsehood—that multiple accounts were involved instead of just one—suffers from the same flaw.  The third alleged falsehood—that Shin "attacked" the ICON Network—is the concluding opinion at issue itself.

The Medium Post outlined each of the facts underlying ICON's opinion about the August 22, 2020 incident.  Because Shin does not dispute those underlying facts in the Amended Complaint, the phrases he identifies as defamatory—"malicious attacker" and the word "stolen"— are unactionable opinions as pleaded and cannot form the basis of his defamation claim.

### 3.    Pleading with Specificity

ICON argues that Shin does not plead the statements it allegedly made to the Exchanges with sufficient particularity.  The requirements of Rule 8 are met with respect to defamation claims so long as the allegations provide the defendant with "sufficient notice of the communications complained of to allow [the defendant] to defend [itself]."  *PAI Corp. v. Integrated Sci. Sols., Inc.*, No. C-06-5349 JSW(JCS), 2007 WL 1229329, at *7 (N.D. Cal. Apr. 25, 2007) (citation omitted).  "Countless district courts," including this District, "have found that the requirements of Rule 8 have not been met in cases where libel and slander claims failed to allege the substance of the statements and/or the time and place in which they were made."  *Id.* at *8 (citing cases).

Shin alleges that ICON informed the Exchanges that he was a "malicious attacker" and that the ICX tokens he transferred to their exchanges were "stolen."   Am. Compl. ¶ 79.  That suffices for identifying the substance of the statements underlying his defamation claim.  He also sufficiently identifies *when* the statements were made.  He alleges that he generated the tokens at

13

issue on August 22, 2020, ICON announced the Revision 10 Proposal in the Medium Post on August 24, 2020, and, in the interim on or about August 23, 2020, ICON made its defamatory statements to the Exchanges, as reflected in the Medium Post. *See* Am. Compl. ¶¶ 5–9, 62–73, 76–85, 102.

With respect to *who* made statements to the Exchanges or *to whom* they were made, Shin simply states that ICON made the statements to the Exchanges, without distinguishing between the two Exchanges or pleading facts specific to communications with either one. His reliance on the sufficiently pleaded defamation claim in *Clougherty v. Lonsdale*, No. C 15-00382 WHA, 2015 WL 2062476 (N.D. Cal. Apr. 30, 2015) does not hold. The plaintiff in that case sufficiently laid out "who Clougherty made the allegedly defamatory statements to (the former girlfriend, the former girlfriend's current boyfriend, and the Stanford professor), the general timeline of when Lonsdale learned of the defamatory statements (after February 2014), and the content of the allegedly defamatory statements (that Lonsdale had sexually assaulted Clougherty)." *Id.* at *2. While Shin has pleaded the substance of ICON's statements and when they were made, he has not specifically alleged, unlike the plaintiff in *Lonsdale*, who made the statements and to whom the statements were made. *See id.* (distinguishing *PAI Corp.*, 2007 WL 1229329, at *9, because "Lonsdale, in contrast, has alleged who made the statements (Clougherty), generally when they were made, and to whom they were made"). He does not cite any case law that would support finding his *who* and *to whom* allegations sufficient at the pleadings stage. *See MacKinnon v. Logitech Inc.*, No. 15-CV-05231-TEH, 2016 WL 541068, at *5 (N.D. Cal. Feb. 11, 2016) (finding "fail[ure] to identify who made any of the alleged statements, when they were made, or to whom they were made" was "fatal to [plaintiff's] defamation claim").

Given the pleading deficiencies discussed above, ICON's motion to dismiss the defamation claim is GRANTED with leave to amend.

### B.    Anti-SLAPP Motion

The purpose of the anti-SLAPP statute is "to allow early dismissal of meritless first amendment cases aimed at chilling expression," but the Ninth Circuit has ruled that "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the

14

plaintiff leave to amend would directly collide with [Federal Rule of Civil Procedure's] 15(a)'s policy favoring liberal amendment." *Verizon Del., Inc. v. Covad Communs. Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004). Shin has amended his complaint once as a matter of course pursuant to Rule 15(a)(1)(B), *see* Dkt. No. 31, but this is the first time I am ruling on the sufficiency of his pleading. Because it is not clear that leave to amend would be futile, striking his defamation claim "would 'directly collide' with Rule 15's liberal amendment policy." *Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 820 (N.D. Cal. 2019).

Given my ruling on ICON's motion to dismiss, I will not reach the motion to strike the defamation claim at this stage. ICON's anti-SLAPP motion and request for fees is DENIED without prejudice. ICON may renew its motion in response to any amended complaint. *See Wynn*, 75 F. Supp. 3d at 1231 n.1 (N.D. Cal. 2014) (declining to address merits of defendant's anti-SLAPP motion because defamation claim was dismissed with leave to amend, but permitting defendant to re-raise anti-SLAPP arguments); *Art of Living Found. v. Does*, No. 10-CV-05022-LHK, 2011 WL 2441898, at *9 (N.D. Cal. Jun. 15, 2011) (same); *Version2 Tech., Inc. v. NeilMed Pharms., Inc.*, No. 16-cv-04720-LB, 2016 WL 6611015, at *8 (N.D. Cal. Nov. 9, 2016) (same).[2]

## II. CONVERSION

"Conversion is the wrongful exercise of dominion over the property of another." *Oakdale Village Group v. Fong*, 43 Cal. App. 4th 539, 543–544, (1996). The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages. *Id.*; *Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003). However, "[i]t is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or

---

[2] To avoid further briefing on the matter, I make a note about whether a Rule 12(b)(6) or a Rule 56 standard would apply to ICON's anti-SLAPP motion. In its current motion, ICON contends that because it challenges the factual sufficiency, not the legal pleading sufficiency of Shin's defamation claim, a Rule 56 standard should apply. ICON's motion to strike, however, largely mirrors its motion to dismiss, which raises a legal sufficiency challenge subject to a Rule 12(b)(6) standard. *Compare* MTD 18–21 *with* Mot. Strike 8–11. Even if ICON's motion to strike raises a factual sufficiency challenge, "discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018).

ownership over the property, or that the alleged converter has applied the property to his own use." *Oakdale*, 43 Cal. App. 4th at 544.

Shin frames the elements of conversion slightly differently based on the California Civil Jury Instructions. *See Ox Labs, Inc. v. Bitpay, Inc.*, No. CV 18-5934-MWF (KSX), 2020 WL 1039012, at *1 (C.D. Cal. Jan. 24, 2020) ("Plaintiff must prove the following five factual elements to establish a conversion claim: (1) that the plaintiff owned, possessed, or had a right to possess the property; (2) that the defendant substantially interfered with the plaintiff's property by knowingly or intentionally taking possession of the property or refusing to return them after the plaintiff demanded its return; (3) that the plaintiff did not consent; (4) that the plaintiff was harmed; and (5) that the defendant's conduct was a substantial factor in causing the plaintiff's harm.") (citing California Civil Jury Instructions ("CACI") 2100 (2019)).  Under either iteration of the standard, the main dispute here is whether Shin has alleged that ICON "substantially interfered with [his] property by knowingly or intentionally taking possession of the property," which can be in the form of "an assumption of control or ownership over the property."  *Oakdale*, 43 Cal. App. 4th at 544; *Ox Labs*, 2020 WL 1039012, at *1.[3]

Shin contends that ICON substantially interfered with his ICX tokens in his personal digital wallet when ICON released the Revision 10 Proposal that "blacklist[ed]" those ICX tokens and thus "effectively froze all of Shin's ICX tokens, including the ICX tokens he had previously purchased."  Am. Compl. ¶¶ 85, 92, 122.  He alleges that the Revision 10 Proposal was "aimed at interfering with and programmatically restricting all of [his] ICX," and thus the release of Revision 10 qualifies as an assumption of control over his ICX tokens.  *Id.* ¶ 88; Oppo. 10.  He analogizes the situation to a tenant whose landlord has locked him out of his apartment and denied him access to personal property inside.  *See Price v. Hovsepian*, 114 Cal. App. 2d 385, 387 (1952) ("[D]enial of access to their property in this fashion constituted a conversion.").

_____

[3] The parties agree that Shin is not required to allege that ICON applied the ICX tokens for its "own use" "so long as [he] shows an assumption of control or ownership of the property inconsistent with [his] possessory or ownership rights."  Cal. Civ. Prac. Torts § 15:8 (citing *Susumu Igauye v. Howard*, 114 Cal. App. 2d 122, 126 (1952)).

In response to ICON's argument that it is not the "responsible actor" for the Revision 10 release because only P-Reps can vote to determine when to update the code, Shin asserts that ICON directly controlled more than 30% of the total stake weighted vote and also controlled "ICX_Station", the second largest P-Rep measured by stake weighted at more than 13%. Am. Compl. ¶¶ 105 –06. ICON points out that, even if it voted all of its 43% stake-weighted ICX in favor of the Revision 10 Proposal, it still would not have been enacted without the votes of other P-Reps because at least 15 of the 22 P-Reps and 67% of the stake-weighted ICX vote are required for the passage of any software update proposal. *Id.* ¶ 100.

I agree that this allegation alone would not be enough to plausibly allege ICON's de facto control over the ICON Network. But the Amended Complaint offers more. In addition to alleging ICON's control over "more than 43% of the stake weighted ICX vote share," Shin alleges that ICON induced other P-Reps to vote in favor of the Revision 10 Proposal it drafted by only stating that the proposal was aimed at "fixing a vulnerability" but not revealing that "it was also aimed at interfering with and programmatically restricting all of Shin's ICX." *Id.* ¶ 88. At least one P-Rep later publicly commented that "I personally think the actor (I don't think he was a hacker because he didn't hack anything) should be able to keep the ICX and do as he pleases." *Id.* ¶ 94. It is plausible that some P-Reps may have rejected the Revision 10 Proposal had they known that it would interfere with Shin's access to his ICX.

By presenting the Revision 10 Proposal the way it did, Shin alleges that ICON was able to achieve the 15 votes necessary to implement the proposal "within a timespan of *just 10 minutes*," when the "average network proposal takes approximately 10 hours." *Id.* ¶¶ 108–09 (emphasis in original); *see also id.* ¶¶ 108, 111 (alleging that P-Reps have "never rejected a network proposal submitted by ICON," and that "the speed in which the Revision 10 Network Proposal was implemented demonstrates that ICON coordinated with other P-Reps to direct and control their vote, likely relying on defamatory statements about Shin").

Shin also cites several public statements made by ICON that "signal its control over the Network Proposal approval process." *Id.* ¶ 102. For instance, after implementing the Revision 10 Proposal, ICON announced that "*we* were able to recover the majority of the stolen funds," and

during the implementation of a different July 2020 Network Proposal, ICON founder, Min Kim, tweeted that ICON was responsible for the issue arising from the software update, stating "*we* take full responsibility for this and cover any damage." Am. Compl. ¶¶ 102–04 (emphasis added). Taken together, these allegations plausibly establish that ICON had de facto control over the network approval process, including approval of the Revision 10 Network Proposal.

What is not clearly alleged, however, is how the implementation of the Revision 10 Network Proposal impacted Shin's access to his ICX tokens. ICON disputes that the release of the Revision 10 Proposal can qualify as an "assumption of control" because Shin concedes that he still has access to the ICX tokens in paragraph 87 of the Amended Complaint.

Shin alleges that it is "false that ICX recovered the majority of the funds" he generated during the August 2020 incident because "[he] still has access, albeit restricted access, to the majority of the 14 million ICX tokens he generated, despite ICON's unlawful attempts to prevent him from accessing or using them." Am. Compl. ¶ 87. This allegation appears to contradict other allegations in the Amended Complaint. *See, e.g.*, *id.* ¶ 88 (ICON "restrict[ed] all of [his] ICX"). It is also not clear whether ICON restricted his access to only the 14 million ICX tokens generated during the August 2020 incident or to all his ICX tokens, including ones he purchased prior to that incident. C*ompare id.* ¶ 9, 92 (alleging Revision 10 Proposal "targeted *all* of Shin's ICX tokens and programmatically locked them from being used"; "Revision 10 Proposal released by the ICON network effectively froze *all* of Shin's ICX tokens, including the ICX tokens he had previously purchased") (emphasis added) *with id.* ¶¶ 87, 110 (alleging Revision 10 Proposal restricted access to "the majority of the 14 million ICX tokens he generated"; ICON "effectively [froze] 14 million ICX in the matter of minutes"). Shin fails to address these contradictions in his opposition brief. I will give him leave to amend to fix this deficiency and plausibly explain what implementation of the Revision 10 Proposal did to his access of the ICX tokens, whether the access to all or specifically the 14 million generated ICX tokens were impacted, and how the restriction at issue in this case qualifies as an "assumption of control."

ICON's motion to dismiss the conversion claim is GRANTED with leave to amend.

### III.   TRESPASS TO CHATTEL

To prevail on a claim for trespass to chattel, Shin must allege that ICON intentionally and without authorization interfered with his possessory interest in personal property and that such unauthorized use proximately resulted in damage to him. *See In re Facebook Internet Tracking Litig.*, 263 F. Supp. 3d 836, 842 (N.D. Cal. 2017). "Conduct that does not amount to a substantial interference with possession, but which consists of intermeddling with or use of another's personal property, is sufficient to establish a cause of action for trespass to chattel." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000). ICON argues that, like the conversion claim, the trespass to chattel claim fails because Shin has not alleged that ICON exercised dominion over his property.[4]

Shin alleges that ICON's release of the Revision 10 Proposal and its efforts to implement the Revision 10 Proposal constitute "intermeddling with" his "use" of his "personal property," causing injury by precluding him from transferring, spending, or otherwise using the ICX tokens as designed on the ICON Network. Oppo. 13; *see* Am. Compl. ¶ 127. Although he has adequately alleged that ICON had "de facto control" over the network proposal approval process, particularly with respect to the implementation of the Revision 10 Proposal, he does not, as discussed above, plausibly explain what exactly the Revision 10 Proposal did and how that "intermeddled" with his "use" of his "personal property." A trespass to chattel claim fails where the alleged property in dispute "remain[s] unaltered and available to Plaintiff." *See 123 Los Robles LLC v. Metzler*, No. 2:17-CV-00392-RGK-SK, 2017 WL 10311210, at *5 (C.D. Cal. Aug. 14, 2017).

The trespass to chattel allegations in the Amended Complaint primarily focus on the

---

[4] ICON also argues, but drops in its reply brief, that the trespass to chattel should be dismissed because it is duplicative of the conversion claim. MTD 17. ICON's reliance *on J & J Sports Prods., Inc. v. Enciso-Chavez*, No. 6:17-CV-01430-MC, 2018 WL 5298146, at *4 (D. Or. Oct. 24, 2018) is misplaced because that case involved a default judgment ruling that would not allow a double recovery for both statutory and trespass claims. At the pleading stage, Federal Rule of Civil Procedure 8(d) expressly permits a plaintiff to plead claims in the alternative. *See* Fed. R. Civ. P 8(d); *see also Garcia v. City of King*, No. 5:16-CV-06712-EJD, 2017 WL 5194519, at *9 (N.D. Cal. Nov. 9, 2017) (allowing both trespass to chattel and conversion claims to proceed past pleadings stage); *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007) (same).

Revision 10 Proposal and the restricted ICON wallet access. In a passing argument made in his opposition brief, Shin attempts to further base his trespass to chattel claim on the restricted access to his exchange accounts on Kraken and Binance. He contends that ICON's actions "were at least a substantial factor in causing the exchanges to freeze his funds," and thus ICON is "liable for Shin's harm for his inability to use his funds on the exchanges." Oppo. 15. To the extent that he chooses to bring a trespass to chattel claim based on his frozen exchange accounts, he must plausibly allege how ICON "intermeddled" with his access and use of the tokens in those exchange accounts, particularly in light of ICON's argument that it does not have any "control" over those accounts.

ICON's motion to dismiss the trespass to chattel claim is GRANTED with leave to amend.

## IV. DECLARATORY RELIEF

"Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. Washington*, 759 F.2d 1353, 1356–1357 (9th Cir.1985). "A claim for declaratory relief is unnecessary where an adequate remedy exists under some other cause of action." *Mangindin v. Washington Mut. Bank*, 637 F. Supp. 2d 700, 707 (N.D. Cal. 2009). For example, in *Tech. & Intell. Prop. Strategies Grp. PC v. Fthenakis*, No. C 11-2373 MEJ, 2011 WL 3501690, at *9 (N.D. Cal. Aug. 10, 2011), the defendant brought a conversion counterclaim against his former employer, alleging that the employer "wrongfully took his personal property, including a personal computer, a computer monitor, software and various books, proprietary manuals, and personal files, and converted it to their own use." The defendant also brought a declaratory relief counterclaim, seeking a declaration that he was "entitled to retain his own personal property, including books he owned before his employment." *Id.* The court dismissed the declaratory relief counterclaim, finding it "needlessly duplicative" because "the requested declarations are wholly dependent on the Court's findings on his substantive claims" and the defendant "offer[ed] no reason to believe declaratory judgment will resolve any issues aside from those already addressed by the substantive claims." *Id.* at *10.

Shin's declaratory relief claim is similarly "needlessly duplicative." He seeks a declaration that "the ICX tokens issued on August 22, 2020, are his property and that he is entitled to exercise his property interests in the ICX tokens that he had accumulated prior to that date, and in the other types of tokens that he had acquired before and after that date." Am. Compl. ¶ 119. His disputed ownership of the ICX tokens is an element of both his conversion and trespass to chattel claims and is an issue that will be resolved in the adjudication of those claims.

Shin argues that no precedent requires him to have to explain to any third parties how a judgment on his other claims establishes his ownership interest. Oppo. MTD 8. Even so, his declaratory relief claim remains "needlessly duplicative" given the substantive claims in the Amended Complaint. *See Vigdor v. Super Lucky Casino, Inc.*, No. 16-CV-05326-HSG, 2017 WL 2720218, at *8 (N.D. Cal. Jun. 23, 2017) ("A claim for declaratory relief is unnecessary where an adequate remedy exists under some other cause of action"; "where a plaintiff has alleged a substantive cause of action, a declaratory relief claim should not be used as a superfluous second cause of action for the determination of identical issues subsumed within the first.") (citations omitted)

ICON's motion to dismiss the declaratory relief claim as duplicative is GRANTED. Shin has leave to amend the claim to the extent he can allege that his declaratory relief claim is appropriate as a separate and independent cause of action.

## V.    PRIMA FACIE TORT

Shin alleges that ICON has committed a "prima facie tort at least to the extent its conduct does not give rise to other recognized tort." Am. Compl. ¶ 142. ICON moves to dismiss the claim on the grounds that a prima facie tort is not a cognizable cause of action under California law. *See Young v. City of Visalia*, 687 F. Supp. 2d 1155, 1165 (E.D. Cal. 2010) ("[T]he prima facie tort doctrine is not intended to supplant traditional tort elements or traditional tort defenses," and that "California courts have refused to extend it into areas of established tort liability" (quotation marks and citation omitted)).

Shin contends that his prima facie tort claim is brought under Colorado law and, in contrast to California courts, Colorado courts have not declined to recognize prima facie tort. Oppo. 21.

To support his "best prediction" that Colorado courts would sustain his claim of prima facie tort, he argues that Colorado generally follows the Restatement (Second) of Torts and section 870 of the Restatement recognizes a prima facie tort as a standalone claim. *See* Restatement (Second) of Torts § 870 (1979) ("[O]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances," and "this liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.").

Shin cites *Douglass v. Hartford Ins. Co.*, 602 F.2d 934, 936 (10th Cir. 1979), where the Tenth Circuit, referring to the lower court's opinion, stated "Since Colorado recognizes prima facie torts in other respects, I see no reason why they wouldn't recognize it here." *Douglass* did not address a claim for prima facie tort. In deciding whether Colorado courts would recognize "negligent entrustment" as an actionable tort, the Tenth Circuit used the Restatement, particularly sections 308 and 316 on negligent entrustment, as a guiding legal principle to ultimately conclude that Colorado courts would recognize such a claim. *Douglass*, 602 F.2d at 936 –37. *Douglass* does not stand for the proposition that, as Shin suggests, Colorado recognizes all torts specified in the Restatement, including section 870.

To the contrary, the case law indicates that Colorado adopts sections of the Restatement on a case-by-case and section-by-section basis. *See, e.g.*, *Redies v. Nationwide Mu. Ins. Co.*, 711 F. Supp. 570, 574 (D. Colo. 1989) (considering whether to adopt section 766A of the Restatement because Colorado had already adopted section 766B and therefore "it is likely that 766A would be adopted by the Colorado courts in a case such as this"); *Casebolt v. Cowan*, 829 P.2d 352, 357 (Colo. 1992) ("In electing to utilize sections 308 and 390 of the Restatement to guide us in our analysis, we follow a path already taken by a number of other states that have employed, approved, or adopted those Restatement rules as part of their negligence jurisprudence."). Shin fails to cite any case that specifically adopted section 870 of the Restatement and recognized a prima facie tort as a cognizable claim under Colorado law. Notably, when considering the laws of other states, the Tenth Circuit has declined to recognize a prima facie tort under section 870 as a

22

standalone claim.[5]

Absent caselaw that explicitly recognizes a prima facie tort claim under Colorado law, I cannot conclude that Shin's claim is cognizable. ICON's motion to dismiss the prima facie tort is GRANTED with prejudice.

## VI.  PUNITIVE DAMAGES

ICON moves to dismiss the claim for punitive damages that Shin seeks under his conversion, trespass to chattel, and defamation claims and in his prayer for relief. MTD 22. Obviously, because I am dismissing all causes of action the punitive damages claim must be dismissed as well. But that is not the only defect with this claim.

In order to sustain a claim for punitive damages, a plaintiff must allege that the defendant has acted with "oppression, fraud, or malice." *California Spine & Neurosurgery Inst. v. Aetna Life Ins. Co.*, No. CV 18-6829-DMG (KSX), 2019 WL 1878355, at *2 (C.D. Cal. Mar. 7, 2019) (quoting Cal. Civ. Code § 3294(a)). Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). Oppression means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(2). Fraud is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

Shin asserts that ICON knowingly misrepresented the circumstances of his ownership of the ICX tokens to the exchanges and P-Reps to assist it with its tortious conduct and that because "ICON was aware that its misrepresentations were false and that their statements would result in injury to Shin's property, they constitute malicious and fraudulent acts under California law."

---

[5] *See, e.g.*, *Beren v. Ropfogel*, 24 F.3d 1226, 1230 (10th Cir. 1994) (rejecting use of the "catchall" prima facie tort from section 870 where it was duplicative of Kansas's "interreference-with-inheritance" tort); *Est. of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 862 (10th Cir. 2005) ("We also reject for the same reason plaintiffs' argument that the Restatement (Second) Torts § 870 establishes the tort of spoliation in Oklahoma").

Oppo. 24. That assertion is not supported by the allegations made in the Amended Complaint. The Amended Complaint only states that the statements ICON made to the Exchanges and in the public Medium Post, asserting that Shin was a "malicious attacker" who had acquired "stolen" funds, were false and that, in turn, the Exchanges froze his accounts and the P-Reps voted to approve Revision 10 to block access to his ICON wallet. Am. Compl. ¶¶ 80–81, 91. It does not adequately allege that ICON *knowingly* made such false statements or that it made any of the "multiple misrepresentations" with malice and with knowledge that it would result in injury to Shin's property. *Id.* ¶ 87. Allegations that "ICON did this deliberately to interfere with Shin's ownership of both his ICX tokens all of the other crypto-assets he owned on those exchanges" or that "ICON fabricated and communicated both public and private false statements for the purpose of encouraging, coercing, and ensuring support for its Revision 10 Proposal, which ICON deliberately designed and intended to interfere with Shin's ICX tokens" are conclusory and do not suffice. *Id.* ¶¶ 82, 90.

Shin also fails to identify any officer, director, or managing agent who committed an act of oppression, fraud, or malice. "'[A] corporate entity cannot commit willful and malicious conduct; instead, "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.'" *Roper v. Big Heart Pet Brands, Inc.*, No. 119CV00406DADBAM, 2020 WL 7769819, at *16 (E.D. Cal. Dec. 30, 2020) (quoting *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1148 (N.D. Cal. 2018)); *see also Taiwan Semiconductor Mfg. Co. v. Tela Innovations, Inc.*, No. 14-CV-00362-BLF, 2014 WL 3705350, at *6 (N.D. Cal. July 24, 2014) ("[A] company simply cannot commit willful and malicious conduct–only an individual can.").

Shin relies on the allegation that ICON Strategy and Communications Lead Ricky Dodds contacted him via Twitter Direct Message and accused him of being a "malicious hacker" who needed to return the allegedly stolen ICX tokens or else Dodds would contact "law enforcement." Am. Compl. ¶ 96. This single allegation is not enough. Nor does it explain how the communication between him and Dodds relates to the alleged "malicious conduct" underlying his

24

punitive damages claim. *See, e.g.*, *In re Yahoo*, 313 F. Supp. 3d at 1148 (finding punitive damages claim sufficiently pleaded where plaintiffs "focus[ed] on particular conduct by the Chief Information Security Officers ("CISOs"), including specific allegations that then-CISO found "gaping holes in Yahoo's data security as early as 2014" and "knew about the 2014 Breach as it was happening," but "took no specific actions in response," "mak[ing] plausible Plaintiff's claim that high-ranking executives and managers at Yahoo, including its CISO, committed oppressive, fraudulent, or malicious conduct") (internal quotation marks omitted)

ICON's motion to dismiss the punitive damages claim is GRANTED with leave to amend.

### CONCLUSION

ICON's motion to dismiss is GRANTED with leave to amend, except with respect to Shin's fifth cause of action for prima facie tort, which is dismissed with prejudice. ICON's motion to strike is DENIED without prejudice. Shin has leave to amend within twenty (20) days of this order.

**IT IS SO ORDERED.**

Dated: May 11, 2021

William H. Orrick
United States District Judge